HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GRAYS HARBOR PUBLIC HOSPITAL
DISTRICT NO. 1, d/b/a MARK REED
HOSPITAL,

    Plaintiff,

v.

MICHAEL O. LEAVITT, Secretary of the
United States Department of Health and
Human Services,

    Defendants.

No. 07-5020 RBL

ORDER

    This matter is before the Court on Plaintiff's [Dkt. #10] and Defendant's [Dkt. #9] cross-motions for summary judgment. Plaintiff asks this court to reverse a decision by the Center for Medicare and Medicaid Services ("CMS") Administrator ("Administrator"), acting on behalf of the Secretary of the United States Department of Health and Human Services ("Secretary"), affirming the fiscal intermediary's allocation of nursing "standby" time in Plaintiff's claims for Medicare reimbursement. Defendant asks this Court to affirm the Administrator's decision.

    The Court has reviewed the parties' briefing, as well as the voluminous administrative record. For the following reasons, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's motion for summary judgment.

ORDER
Page - 1

# I. BACKGROUND

## A. Statutory/Regulatory Scheme

Established by Congress under Title XVIII of the Social Security Act, Medicare is a federally funded health insurance program for the elderly and the disabled. 42 U.S.C. § 1395 *et seq*. Under the program, providers enter into agreements with the Secretary to furnish medical care to eligible individuals in return for reimbursement. Reimbursement is generally organized under two categories: Part A authorizes payments for care provided primarily for inpatient services; Part B authorizes payments for outpatient care and durable medical equipment. *See* 42 U.S.C. §§ 1395c-1395i-4; 42 U.S.C. §§ 1395j-1395w-4.

Most providers are reimbursed under the prospective payment system ("PPS"), in which payment is based upon the code for the service or procedure rendered regardless of the provider's actual cost in rendering the service. *See* 42 § U.S.C. 1395ww(d). However, certain providers, including small, rural hospitals providing both inpatient and emergency services, may be certified as "critical access" hospitals ("CAH"), thus becoming eligible for reimbursement based upon their "reasonable costs." *See* 42 C.F.R. § 413.1(d).

Reimbursements to providers are paid by "fiscal intermediaries," private contractors who serve as the Secretary's agent in making claims payments. 42 U.S.C. § 1395h. At the close of each fiscal year, each provider must submit a "cost report" to the intermediary, outlining the costs incurred during the year and the portion of those costs that are to be covered under Medicare. 42 C.F.R. § 413.20. Once received and verified, the cost reports govern payments made by the intermediary to the provider. An intermediary's reimbursement decision may be appealed to the Provider Reimbursement Review Board ("PRRB" or "the Board"), a five-person administrative body within the Department of Health and Human Services. 42 U.S.C. § 1395oo. The Board's decision, in turn, is reviewable at the discretion of the CMS Administrator. 42 C.F.R. § 405.1875.

## B. Factual Background

The underlying facts in the instant case are not in dispute. Plaintiff, Grays Harbor Public Hospital District No. 1 d/b/a Mark Reed Hospital ("Mark Reed" or "the Hospital"), is a small, non-profit hospital located in McCleary, Washington. Like many rural hospitals, Mark Reed sees low inpatient utilization and

a relatively high number of emergency room visits.[1] On July 1, 2000, Mark Reed obtained its certification as a CAH, thus becoming eligible for more favorable Medicare reimbursement rates for inpatient care [*See* A.R. 191, 377]. On March 28, 2001, three months into the 2001 cost report fiscal year (the first full year for Mark Reed as a CAH), Mark Reed's Administrator sent the following memorandum to the hospital's nursing staff:

> There is a change in how you need to allocate your time on your time cards.
>
> Previously you had been directed to allocate the majority of your time to the ER. This is no longer the case, and this change is very important to our reimbursement.
>
> Your are to allocate to ER only time that you are actually taking care of an ER patient (same for AHC, Dietary, etc.).
>
> All the time that is not specifically allocated to another department now goes to **acute care**, which is considered by Medicare to be your "home" department.
>
> Your **immediate** attention to this change is greatly appreciated.

[A.R. 599] (emphasis original). The resulting change in reporting substantially increased the number of hours claimed for acute care (also referred to as "Adult & Pediatric" or "A&P") [A.R. 595-608]. Because the percentage of patients utilizing Medicare in A&P was markedly higher than in the ER (86% as opposed to 21%), Mark Reed reported a 731 percent increase in routine costs for A&P from its previous cost reporting year [A.R. 595].[2]

The jump in reported costs apparently triggered an audit by the fiscal intermediary. Following a field review, the intermediary determined that there had been no change in operations at the Hospital and attributed the spike solely to the change in reporting employed by Mark Reed and its nursing staff [A.R. 582]. The intermediary also rejected the concept of a "home" department as being "unsupported by any regulation, Provider Manual, cost accounting theory, hospital licensing issues, or common sense." [AR 71]. Because Mark Reed did not maintain sufficient records to allocate nursing time to the cost centers where the employees actually worked (Mark Reed had records for only one-third of the 2001 fiscal year),

---

[1] According to the intermediary, Mark Reed's inpatient utilization for 2001 was approximately 2.6% (76 inpatient days out of a potential 2,920); by contrast, the ER treated approximately 12.5 patients per day [A.R. 70].

[2] According to the intermediary, Mark Reed's average daily cost of treating an inpatient rose from $1,505 to $7,405 [A.R. 595].

ORDER
Page - 3

the intermediary attempted to estimate the Hospital's actual costs in an effort to re-allocate the "standby" nursing time to those cost centers where the employees actually worked [A.R. 7]. Specifically, the intermediary allowed 24 hours for every actual patient day in A&P (60 in total) to determine actual costs in the A&P cost center [A.R. 583]. The intermediary then used the existing time records for all other cost centers to estimate actual and standby time to be allocated to each center [*Id.*]. The readjustment resulted in a significant drop in Mark Reed's Medicare reimbursement for 2001.

**C. Procedural Background**

Mark Reed appealed the intermediary's adjustment to the Board, arguing that its original calculations more accurately represented its actual costs. In support of this assertion, Mark Reed relied on two Washington regulations, WAC 246-320-365 (requiring a physician or mid-level practitioner to be available within thirty minutes to provide emergency room services) and WAC 246-320-345 (requiring a nurse to be on-site at all times for inpatient care, regardless of actual utilization) [A.R. 63-64].[3] Because of the constant staffing necessary for inpatient care, Mark Reed asserted that standby costs were properly (and indeed necessarily) reported in A&P. Mark Reed also argued that such a practice was consistent with that of its peers and presented an array of statistical data to demonstrate that the intermediary's calculus placed Mark Reed far outside the average cost reports for the twenty-one other Washington CAHs [A.R. 63].

The Board agreed and instructed the intermediary to reallocate Mark Reed's reimbursement costs by: 1) determining actual ER time for January and February 2001 by annualizing the months where actual ER records existed (March and July 2001); 2) determining the actual A&P time for March through December 2001 by annualizing months where actual A&P records existed (January and February 2001); and 3) determining actual time for all other cost centers by annualizing data from January, February, March, and July 2001 [A.R. 64]. Apparently relying on an erroneous interpretation of the state regulatory requirements, however, the Board determined that the remaining time, representing "standby" time, should

---

[3] The regulation germane to the present action, WAC 246-320-345, provides: "Hospitals will ... [h]ave a registered nurse in the hospital at all times and available for consultation." WAC 246-320-345(2).

ORDER
Page - 4

be allocated "equally and exclusively" between the A&P and ER cost centers [*Id.*].[4]

The Center for Medicare Management ("CMM") sought discretionary review of the Board's decision and requested reversal of the Board's re-allocation of nursing costs [A.R. 2]. CMM commented on Mark Reed's failure to maintain proper documentation, which could have led to a denial of all disputed costs, and noted that the Board's methodology did not effectively allocate nursing time to those centers where the nurses actually worked [A.R. 4]. The Administrator reversed the Board and reinstated the fiscal intermediary's ruling as a "reasonable methodology" for determining Mark Reed's nursing hours in the absence of proper documentation [A.R. 7]. Relying, in part, on 42 U.S.C. 1395x(v)(1)(A) ("the reasonable cost of any services shall be the cost actually incurred"), the Administrator found that Mark Reed's allocation did not result in accurate cost finding and was "not supported by Medicare law, regulations or policy guidelines." [A.R. 5, 7]. Specifically, the Administrator concluded that Mark Reed failed to maintain adequate records to support its claimed costs and that the 50-50 split between A&P and ER ordered by the Board was a less accurate method of cost finding that resulted in "inappropriate cost-shifting" [A.R. 7-8].

Mark Reed subsequently filed the instant judicial review asking this court to reverse the Administrator's decision.

## II.  DISCUSSION

**A. Standard of Review**

At its essence, Plaintiff's challenge goes to the Secretary's construction, made through the Administrator, of "reasonable cost" as defined in the Medicare statute and regulations. More precisely, Plaintiff objects to the Secretary's apparent refusal to take state staffing requirements into account when allocating standby work hours for which no records otherwise existed. It is difficult to overstate the hurdles that a plaintiff seeking judicial review faces in such situations. The boundaries of this Court's review are established in the Administrative Procedure Act ("APA"), which is incorporated by the Social Security Act. *See* 42 U.S.C. § 1395oo(f)(1). Under the APA, this Court may set aside the Secretary's

---

[4] Although Plaintiff seeks, *inter alia*, reinstatement of the Board's allocation, Plaintiff readily acknowledges that the Board's interpretation of the Washington regulatory scheme was a "misconstruction" [Dkt. #10, p. 8].

findings *only* if unsupported by substantial evidence or if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (E).

Additionally, this Court "must give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (citations omitted). Thus, the task at hand "is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id*. (internal quotations and citations omitted). Such deference is particularly appropriate where, as here, "the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Id*. (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991) (internal quotations removed)).

On the other hand, however, the Supreme Court has emphasized that the APA requires a "meaningful review," and courts are not simply to rubber-stamp agency factfinding; thus, deference in this context does not translate into abdication. *See Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 490 (1951)).

**B. Analysis of the Secretary's Decision**

Under Title XVIII, "Congress authorized the Secretary of Health and Human Services to issue regulations defining reimbursable costs and otherwise giving content to the broad outlines of the Medicare statute." *Thomas Jefferson University*, 512 U.S. at 506-7. This authority includes the discretion to set the "reasonable cost" of services as well as the items to be included in the category of reimbursable services. *Id*. at 507. Pursuant to this authority, the Secretary has promulgated regulations that require all payments to providers be based on the "reasonable cost of services covered under Medicare and related to the care of beneficiaries ... [including] all necessary and proper costs incurred in furnishing the services[.]" 42 C.F.R. § 413.9(a). Thus, to ensure fairness to providers, patients, and contributors to the Medicare trust funds, provider reimbursement "is intended to meet the *actual costs*, however widely they may vary from one institution to another." *See* 42 C.F.R. § 413.9(c)(1), (2) (emphasis added).

In this case, Mark Reed does not launch an outright attack on the Secretary's decision to reimburse based on actual costs incurred. Rather, as noted above, Mark Reed takes issue with the Administrator's

allocation of nursing standby hours that are not otherwise accounted for by its actual records. Specifically, Mark Reed claims that the Administrator's refusal (or failure) to take state staffing requirements into account in her allocation methodology is arbitrary and capricious. Thus, Mark Reed renews the argument, brought before both the Board and the Administrator, that its standby nursing hours *must* be allocated to the A&P cost center because state regulations require it to provide continuous staffing for inpatient care, regardless of actual utilization.

To bolster its assertion, Mark Reed points to statistical data from other Washington CAHs in an effort to show that its 2001 cost report was in line with similarly situated institutions and to illustrate what it terms an "anomaly" produced by the Administrator's allocation. By using the relative conformity between its pre-adjustment numbers and other CAHs' reported costs, Mark Reed infers a commonality between its reporting practices and that of its peers. The most stark of these comparisons shows that, in 2001, the average percentage of wages between inpatient care and ER care for Washington's twenty-one CAHs was 67% and 33% respectively; as adjusted by the Administrator, Mark Reed's 2001 wages are 19% for inpatient care and 81% for the E.R. [A.R. 386]. Mark Reed also claims that the adjusted calculations place the Hospital's average nursing time for the ER from 1.66 hours per patient visit (based on months where time records are available) to 3.63 hours, a number Mark Reed claims to be wholly out-of-step with its actual ER practice [A.R. 329].

Regardless of statistical anomalies, however, the fact remains that Mark Reed simply failed to keep records that would enable an accurate calculation of Mark Reed's actual nursing costs. In the absence of such records, this Court cannot be called upon to determine which of two competing estimations is the more reasonable, or even more accurate, methodology. Instead, the task at hand is solely to determine whether the challenged methodology strays so far from the mark as to render it arbitrary and capricious or contrary to the law. Mark Reed has simply not met its burden in this regard. Given the record presently before the Court, the Administrator's calculations present, at the very least, a good-faith and reasonable effort to establish reimbursement based upon Mark Reed's actual costs.

Mark Reed's reliance on the state staffing requirements is ultimately unavailing. As pointed out in the government's brief, the regulations at best describe where Mark Reed's nursing staff *should* have been working, not where they actually worked. Thus, the Administrator's refusal to automatically place all

standby time into A&P is not unreasonable. Providers are reimbursed based on their actual costs. To the extent that Washington law required Mark Reed to have a nurse assigned exclusively to inpatient care at all times, Mark Reed should have accurately recorded as much. Additionally, given the ambiguity created by the lack of records, Mark Reed cannot cry foul when the *ex post facto* divination of disputed time fails to go its way. In fact, instead of denying reimbursement for the disputed hours, a course of action that was apparently available to the Administrator, the Administrator chose to estimate Mark Reed's actual standby costs and reimburse accordingly. On the balance of things, Mark Reed could have found itself in far more dire circumstances.

Mark Reed's argument regarding the practices of other Washington CAHs, while persuasive, is similarly unavailing. There is nothing in the record to suggest that the other Washington hospitals, like Mark Reed, failed to maintain adequate records to establish where their employees spent their time. Indeed, this Court has been presented with no evidence to suggest that the Administrator would have rejected Mark Reed's cost report had the Hospital been able to show that its nursing staff actually spent their standby time (because of state regulations or otherwise) in the A&P cost center. Mark Reed also misplaces its reliance on 42 C.F.R. § 413.20 (stating that "[s]tandardized definitions, accounting, statistics, and reporting practices that are widely accepted in the hospital and related fields are followed"). Even if the regulation did require the Administrator to take the cost reporting of other CAHs into account, a dubious proposition at best, the fact that Mark Reed's original report placed its costs in the ballpark of other CAHs does not establish a "widely accepted" methodology for allocating nursing time.

As a result, this Court finds that the Administrator's allocation is not plainly erroneous, nor is it inconsistent with regulations requiring reimbursement based on actual costs.

### III.  CONCLUSION

Defendant's Motion for Summary Judgment [Dkt. #9] is hereby GRANTED. Plaintiff's Cross-Motion for Summary Judgment [Dkt. #10] is DENIED.

IT IS SO ORDERED.

DATED this 6th day of December, 2007.

_____
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE